Barbara BOYD, Plaintiff,

v.

The PRESBYTERIAN HOSPITAL IN the CITY OF NEW YORK, Columbia–Presbyterian Medical Center, and Kathleen Dunleavy, Defendants.

No. 95 Civ. 3847(DAB).

United States District Court,
S.D. New York.

March 30, 2001.

As Amended April 17, 2001.

Noah A. Kinigstein, New York, New York, for Plaintiff.

Jackson, Lewis, Schnitzler & Krupman, New York, New York, Gregory I. Rasin, Jennifer B. Courtian, for the Defendants, of counsel.

## OPINION

BATTS, District Judge.

Barbara Boyd, ("Plaintiff"), an African-American woman, brings this action for declaratory and injunctive relief and damages pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981 (" § 1981"). Plaintiff alleges that the Defendants, Presbyterian Hospital in the City of New York (the "Hospital"), and Kathleen Dunleavy, ("Dunleavy"), (collectively "Defendants"), discriminated against Plaintiff on the basis of her race. Defendants move pursuant to Fed.R.Civ.P. 56, for summary judgment. Alternatively, Defendants move pursuant to Fed.R.Civ.P. 12(f), to strike Plaintiff's request for damages. For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

### A. Plaintiff's Employment

On August 17, 1980, Plaintiff began her employment with the Hospital as a staff nurse. (Pl.'s 56.1 Stmt. ¶ 1; Defs.' 56.1 Stmt. ¶ 1.)[1] Plaintiff's duties included "patient care and charge responsibility." (Pl.'s 56.1 Stmt. ¶ 2; Defs.' 56.1 Stmt. ¶ 2.) Plaintiff worked as a staff nurse in various departments within the Hospital until September 1993, when she was assigned to work in the Adult Neurology Department ("Neurology").[2] (Pl.'s 56.1 Stmt. ¶¶ 3–4; Defs.' 56.1 Stmt. ¶¶ 3–4.) Plaintiff continued to work in Neurology as of the filing

---

1. The parties in this civil action submitted their Statements of Material Fact to this Court when Local Civil Rule 3(g) governed such statements. However, as of April 15, 1997, the proper form for such statements is now contained in Local Civil Rule 56.1. Accordingly, the Court shall refer to the parties' submissions as Local Rule 56.1 Statements ("56.1 Stmt.").

2. It appears that Plaintiff had also worked in Neurology as her first assignment at the Hos-

pital in 1980. (Pl.'s Dep. at 26.) During this time, Dunleavy served as Plaintiff's "covering supervisor" when Plaintiff's "NCC" was off duty. (Id. at 32.) In 1993, when Plaintiff returned to Neurology, Dunleavy was then Plaintiff's "NCC." (Id. at 32–33.) Plaintiff's deposition is not clear as to the meaning of "NCC," although the deposition indicates that the "NCC" is a supervisory nurse position. (Id.)

date of Plaintiff's 56.1 Statement. (Pl.'s 56.1 Stmt. ¶ 4; Defs.' 56.1 Stmt. ¶ 4.) In September 1993, Dunleavy became Plaintiff's immediate supervisor when Plaintiff, at her own request, was transferred back to Neurology. (Pl.'s Dep. at 26–30, 32–33.) In September 1995, Dunleavy was transferred to a different department. (Pl.'s 56.1 Stmt. ¶ 8; Defs.' 56.1 Stmt. ¶ 8.) Currently, Dunleavy no longer supervises Plaintiff. (*Id.*)

Plaintiff does not claim she was ever denied a promotion at the Hospital because of any discriminatory treatment by anyone. (Pl.'s 56.1 Stmt. ¶ 48; Defs.' 56.1 Stmt. ¶ 48.) Throughout Plaintiff's employment with the Hospital, Plaintiff was never demoted. (Pl.'s 56.1 Stmt. ¶ 49; Defs.' 56.1 Stmt. ¶ 49.) Plaintiff's level of seniority was never affected in any way and she never was denied a salary increase because of discrimination by anyone at the Hospital. (Pl.'s 56.1 Stmt. ¶ 50; Defs.' 56.1 Stmt. ¶ 50.) Despite the above, Plaintiff nevertheless alleges that Dunleavy discriminated against her during the time Dunleavy served as Plaintiff's supervisor.

## B. The Percocet Incidents

In June 1994, Plaintiff admitted to Dunleavy that she had accidentally taken home a Percocet tablet. (Pl.'s 56.1 Stmt. ¶ 14(h); Defs.' 56.1 Stmt. ¶ 14(h).) Percocet is a narcotic drug. (*Id.*) Plaintiff alleges that subsequently Dunleavy accused Plaintiff of taking home two Percocet tablets in Au-

gust 1994. (Pl.'s 56.1 Stmt. ¶ 14(h); Defs.' 56.1 Stmt. ¶ 14(h).) However, Plaintiff was on vacation in August 1994, a fact which Plaintiff claims that Dunleavy knew.[3] (Pl.'s 56.1 Stmt. at 26; Pl.'s Dep. at 194–96). Dunleavy's August Percocet accusation made the Plaintiff "very upset." (Pl.'s Dep. at 197, 211.) In particular, Plaintiff was concerned that the "accusation" of taking the Percocet tablets could lead to her being "dishonorably discharge[d]" from her military job even though no such result occurred from the admitted June accident.[4] (Pl.'s Dep. at 296.) Plaintiff also claims that in August 1994, Dunleavy told other Hospital employees that Plaintiff had taken the Percocet. (Pl.'s Dep. at 207.)

In September 1994, Plaintiff discussed "The August Percocet Incident" with Marianne Kerner, ("Kerner"), a union delegate. Kerner then filed a grievance on Plaintiff's behalf with the Hospital charging that the union contract had been violated as a result of Dunleavy's "harassment re: inappropriate and false accusation." (Pl.'s 56.1 Stmt. ¶ 30; Pl.'s Dep., at 210–18 (the reference in the Plaintiff's deposition to Maryann Kiernan appears to be simply a transcription error); Defs.' 56.1 Stmt. ¶ 30.) Plaintiff's "Step I" grievance was heard at a meeting at which Dunleavy, Kerner and Plaintiff were present. (Pl.'s 56.1 Stmt. ¶ 32; Pl.'s Dep. at 215; Defs.' 56.1 Stmt. ¶ 32.) At the conclusion of

---

3. After Plaintiff learned that she had been accused of taking Percocet, Plaintiff claims that she said to Dunleavy: "How could you say that? ... I just came back from vacation." Dunleavy allegedly replied: "Oh, I thought it was you." (Pl.'s Dep. at 196.)

4. During the times relevant to this civil action, Plaintiff also served as a nurse in the United States Army Reserve Command. (Pl.'s Kinigstein Affirm., Ex. B. at 5.) Plaintiff was still in the military at the time of her deposi-

tion on November 1, 1995. (Pl.'s Dep. at 297.) Plaintiff refers to many incidents and events in the Memorandum in Opposition to Summary Judgment which are not included in Plaintiff's 56.1 Statement. Many of these references are incorrectly cited or not cited at all. However, the Court has reviewed Plaintiff's entire deposition and has included relevant information in the "Background" section of this Opinion.

"Step I," Kathy Stendor ("Stendor")[5] wrote a letter to Kerner stating that Dunleavy "has apologized for any comment made which may have been misconstrued." (Pl.'s Dep. at 242–43; Rasin Aff., Ex. I.) Kerner and Plaintiff instituted "Step II." (Pl.'s 56.1 Stmt. ¶¶ 34–35; Defs.' 56.1 Stmt. ¶¶ 34–35.) As a result of "Step II," Hospital management sent a letter to a union delegate stating that Plaintiff was not involved with a Percocet loss in her unit.[6] (Rasin Aff., Ex. J.) Also as a result of the "Step II" grievance, Dunleavy wrote a letter to Plaintiff on February 27, 1995, which "assur[ed Plaintiff] that no accusations were made against her regarding her handling of controlled substances." (Pl.'s 56.1 Stmt. ¶ 37; Defs.' 56.1 Stmt. ¶ 37; Rasin Aff., Ex. F.)

## C. Christmas Vacation

Plaintiff alleges that Dunleavy denied Plaintiff's request to have a vacation day on Christmas 1993, and Christmas 1994. (Defs.' 56.1 Stmt. ¶ 14(a); Pl.'s 56.1 Stmt. ¶ 14(a).) Plaintiff claims that in December 1993, Plaintiff had requested vacation for Christmas, but that Dunleavy told her that "she couldn't give [her] the time off [because she doesn't] give vacation time during the holidays."[7] (Pl.'s Dep. at 41–42.) However, Dunleavy claims that she does give vacation on Christmas to employees when it is requested. (Dunleavy Dep. at 128–29.)

Plaintiff claims that a white nurse, Mary McManis ("McManis"), was given vacation from December 25, 1993 to January 7, 1994.[8] (Pl.'s Dep. at 41–42, 60–61.) Thus, in January 1994, the time of the year when the Hospital staff submits vacation request forms for that year, Plaintiff claims that she requested vacation during Christmas 1994. (Pl.'s Dep. at 42.) Plaintiff alleges that Dunleavy again told Plaintiff that she doesn't give vacation during the Christmas holiday. (Id.) Nevertheless, in 1994, Plaintiff was given vacation from December 16, at 7:30 p.m., to December 25, at 7:00 p.m. (Pl.'s Dep. at 100–01.)

As a result of Dunleavy's denial in January 1994 of Plaintiff's request for a vacation day on Christmas 1994, Plaintiff contacted union delegate Marie Fetell, ("Fetell"), who spoke with Dunleavy. (Pl.'s Dep. at 43.) Plaintiff's conversation with Fetell allegedly led to a conversation between Plaintiff and Dunleavy in which Plaintiff claims that Dunleavy told Plaintiff that it is her policy not to "give vacation during the Christmas holiday." (Id.)

Plaintiff claims that she spoke with Dunleavy again, during which Plaintiff com-

5. Plaintiff claims that Stendor is the "Assistant Director" at the Hospital. (Pl.'s Dep. at 51.) Although her responsibilities are not clearly explicated, it appears that she is in a supervisory position to Dunleavy and Plaintiff.

6. Plaintiff disputes that the letter was sent. (Pl.'s 56.1 Stmt. ¶ 36; Defs.' 56.1 Stmt. ¶ 36.) However, Plaintiff does not support this dispute with any citation as required under Rule 56.1. Although Plaintiff claims that she "never received" the letter in question, she also admitted that she doesn't "remember" if she was ever told "anything about the findings from Step II." (Pl.'s Dep. at 301.)

7. Plaintiff contradicts herself in her Deposition, as she also says that she didn't request Christmas in 1993 off, but that she did request it in 1994, at which time Dunleavy said she didn't give vacation. (Pl.'s Dep. at 59–60.) Since Plaintiff arrived in Neurology during September of 1993, she could not have possibly submitted the vacation form necessary in January, 1993 to receive vacation time for Christmas 1993.

8. Defendants dispute Plaintiff's knowledge as to granting another nurse vacation at said time. (Defs.' 56.1 Stmt. ¶ 15.) Plaintiff claims that she learned that McManis got this time off because she "noticed the time sheet." (Pl.'s Dep. at 61.)

plained that Dunleavy's policy of refusing vacation requests on the Christmas holiday was not in the union contract. (Pl.'s Dep. at 77.) The union contract between the New York State Nurses Association and the Hospital grants the Hospital discretion in determining vacation time. (Defs.' 56.1 Stmt. ¶ 15(a); Pl.'s 56.1 Stmt. ¶ 15(a).) Dunleavy's job duties include creating vacation schedules for the nurses under her charge. (Pl.'s 56.1 Stmt. ¶ 18; Defs.' 56.1 Stmt. ¶ 18.)

**D. The Patient Fall**

On Plaintiff's performance appraisal covering the period September 5, 1993, to June 30, 1994, ("1993 evaluation"), Dunleavy attributed one "patient fall" to Plaintiff.[9] (Pl.'s 56.1 Stmt. ¶ 14(g); Defs.' 56.1 Stmt. ¶ 14(g).) Plaintiff contends that the patient who fell was not assigned to her, but was assigned to a white nurse. Plaintiff claims that she had signed the incident report for the patient fall since "the first person that find [sic] the patient should fill out the incident report." (Pl.'s Dep. at 50.) Plaintiff claims that she explained to Dunleavy that the patient fall should not have been attributed to her, but that Dunleavy

refused to remove the patient fall from Plaintiff's evaluation. (*Id.* at 50–51.)

Plaintiff again met with Fetell, this time to discuss the patient fall. (*Id.*) After Fetell called Stendor, Stendor indicated that she would remove the Patient Fall from Plaintiff's evaluation. (Pl.'s Dep. at 52.) The Patient Fall does not appear on Plaintiff's 1993 evaluation. (Rasin Aff., Ex. D.)

**E. Patient Assignments [10]**

At Plaintiff's request, Dunleavy attended a meeting in September 1994, with Plaintiff and Lois Joseph ("Joseph"), the "CN–3"[11] nurse with the most seniority in Neurology. (Pl.'s 56.1 Stmt. ¶ 14(i); Defs.' 56.1 Stmt. ¶ 14(i).) In the meeting Plaintiff complained that Joseph assigned Plaintiff the most difficult patients on the floor. (*Id.*) Plaintiff claims that Dunleavy told her at the meeting that Plaintiff was assigned the most difficult patients because Dunleavy and Joseph knew Plaintiff could handle it.[12] (Pl.'s Dep. at 214.)

**F. Medication Error Incidents [13]**

In June 1995, Dunleavy called Plaintiff into her office and questioned whether

---

9. A "patient fall" appears to be when a patient falls out of bed. (Pl.'s Dep. at 49.)

10. It is clear in pages 40–41 of Plaintiff's signed and sworn deposition, which she had an opportunity to correct, that she claims only problems with Dunleavy. Nevertheless, in her original Complaint she makes allegations of discriminatory behavior relating to other hospital supervisory personnel. (Compl.¶ 25–26.) In her 56.1 Statement, despite her sworn testimony in the deposition, Plaintiff now seeks by reference to an incident involving Lois Joseph, to seek redress for claims that she effectively abandoned at her Deposition.

11. Although neither party explains the CN ranking system of the nurses, it appears that a CN–3 nurse ranks above a CN–1 nurse; Plaintiff was a CN–1 nurse throughout the relevant incidents. (Pl.'s Dep. at 24.)

12. Plaintiff additionally claims that Joseph has twice said to her, most recently in June 1995, that if Joseph didn't like a nurse, she could "give them the worst assignments" and make sure that they were fired. (Pl.'s Dep. at 231–32.)

13. Plaintiff's 1993 evaluation indicates that from September 1993 to June 1994 Plaintiff committed one med error "which she herself acknowledged and reported." (Rasin Aff., Ex. D; *see* Pl.'s Dep. at 158–60 (When confronted with both evaluations and asked the question "Which of these performance evaluations is the one you are referring to when you say that [Dunleavy] included med errors on your performance evaluation?" Plaintiff responded, "On 1994.").) The 1993 evaluation med error, according to a quality assurance form, occurred on June 6, 1994. (Dunleavy Dep. at 40.) This error apparent-

Plaintiff gave the wrong dosage of medication to a patient. (Pl.'s 56.1 Stmt. ¶ 14(b); Pl.'s Dep. at 45; Defs.' 56.1 Stmt. ¶ 14(b).) Although Plaintiff cannot remember the name of the medicine, (Pl.'s Dep. at 114), this first incident involved a general confusion regarding the alternating dose schedule a doctor directed that a patient receive, (Pl.'s Dep. at 46, 102–03, 111). Plaintiff explained to Dunleavy that she had discussed the dosage with a doctor before administering it. (Pl.'s Dep. at 45–48.) Plaintiff claims that a white nurse also working with the patient told Plaintiff that he "made a mistake" concerning the patient's dosage. (*Id.*) Although Dunleavy questioned Plaintiff about the incident, Dunleavy never questioned the white nurse.[14] (*Id.*) This incident concluded with Dunleavy telling Plaintiff that "she did the right thing," and that "[t]he other nurses made a mistake." (Pl.'s Dep. at 115.)

On a different day in June 1995, Dunleavy called Plaintiff into her office to discuss another possible error in the medication administered to one of her patients. (Pl.'s 56.1 Stmt. ¶ 14(c); Defs.' 56.1 Stmt. ¶ 14(c); *see also* Pl.'s Dep. at 121 (stating that this Digoxin incident is the second incident of which Plaintiff complains).) Apparently in this case Plaintiff placed her initials next to an incorrect dosage even though the correct dosage was in fact ad-

ministered to the patient. (Pl.'s Dep. at 124 (stating that the patient needed to receive a .25 dose, received that dose, and that no medication error was committed).) Plaintiff was never reprimanded in connection with the Digoxin incident. (Pl.'s Dep. at 126.)

In addition, Plaintiff claims that Dunleavy "was constantly checking [Plaintiff's] charts to see if [Plaintiff] was making mistakes," and that Dunleavy tried to "hold [Plaintiff] responsible" for the two alleged medication error incidents because of her race. (Pl.'s Dep. at 107–108, 117.) Plaintiff alleges that, after these two incidents, there were rumors among Plaintiff's co-workers that Dunleavy scrutinized Plaintiff's job performance for mistakes "trying her best to get [Plaintiff] fired." (Pl.'s Dep. at 117–19.)

Following these incidents, Plaintiff claims that she spoke with several white nurses who claimed to have made medication errors and had patient falls, but they told her that Dunleavy did not include the med errors on their evaluations. (Pl.'s Dep., at 140–48.) Dunleavy claims that as part of her responsibilities, she has "included on the performance appraisals (including on those) of white nurses under [her] charge the number of medication errors [and patient falls] made by those nurses in the appraisal period." (Dun-

---

ly resulted from the Plaintiff administering the wrong medication to a seizure patient. (Dunleavy Dep. at 24.)

According to Plaintiff and Defendant the med error incidents in this section took place in June 1995. These incidents, then, are not related to the one med error that appears on Plaintiff's 1993 evaluation. To be sure, Plaintiff has conflated the years during which certain med error-related incidents took place. *Compare* Boyd Dep. at 52, 156 (attributing statement that "[t]hree med errors and she is out of this institution" to a conversation that took place after Plaintiff received her 1993 evaluation) *with* Boyd Dep. at 145–47 (attrib-

uting same statement to a conversation that took place after Plaintiff received her 1994 evaluation). The record, however, indicates that "no med errors" were included on Plaintiff's 1994 evaluation. (Rasin Aff., Ex. E.) Despite this fact, Plaintiff claims, with no evidentiary support whatsoever, that a "no med errors" comment on an evaluation implies that the person being evaluated "must make a lot of errors." (Pl.'s Dep. at 149–50.)

14. However, Plaintiff's Deposition indicates that Dunleavy did discuss the incident with another nurse, whose race was not mentioned. (Pl.'s Dep. at 116.)

leavy Aff., at 3.) However, no appraisals of white nurses supporting this assertion were included with the Affidavit. Since Plaintiff never saw other nurses' evaluations, the parties dispute whether Plaintiff has knowledge of whether or not these evaluations in fact included medication errors. (Pl.'s Dep. at 140–48.)

G.   The Patient Teaching Incidents

On several occasions in May 1995, Dunleavy informed Plaintiff that she was not checking off the correct box for "patient teaching" on the nurses' notes to indicate that she had reviewed with her patients their "learning needs." (Pl.'s 56.1 Stmt. ¶ 14(d); Pl.'s Dep. at 48, 137–37; Defs.' 56.1 Stmt. ¶ 14(d).) Plaintiff claims that white nurses were not questioned or reprimanded for failing to check off the correct box for "patient teaching." [15] (Pl.'s Dep. at 48–49.) According to Plaintiff, the alleged failure to check off the "patient teaching" box was mentioned on her evaluation. (Pl.'s 56.1 Stmt. ¶ 15(d); Pl.'s Dep. at 49). However, Dunleavy never reprimanded her "in connection with … not checking off the learning box," or "in any way punished [her] for not checking off that box." (Pl.'s Dep., at 139.)

H.   Plaintiff's EEOC Charges and This Lawsuit

In October 1994, Plaintiff filed her complaint with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights.

(Pl.'s 56.1 Stmt. ¶ 42; Defs.' 56.1 Stmt. ¶ 42.) The following month, Plaintiff spoke to Angela Kelly, ("Kelly"), Labor Relations Specialist from the EEOC, at the Hospital. (Pl.'s 56.1 Stmt. ¶ 39; Defs.' 56.1 Stmt. ¶ 39.) Plaintiff told Kelly "she believed Dunleavy discriminated against her because she accused Plaintiff of taking home two Percocets and included on Plaintiff's performance evaluation a patient fall that was not hers." [16] (Pl.'s 56.1 Stmt. ¶ 40; Pl.'s Dep. at 304; Defs.' 56.1 Stmt. ¶ 40.) Kelly told Plaintiff she would investigate Plaintiff's complaints, and subsequently wrote Plaintiff a letter on December 28, 1994, describing the incidents. (Pl.'s 56.1 Stmt. ¶ 41; Defs.' 56.1 Stmt. ¶ 41; Rasin Aff., Ex. K.)

Plaintiff received a "Notice of Right to Sue" from the EEOC on or about April 7, 1995. (Pl.'s 56.1 Stmt. ¶ 43; Defs.' 56.1 Stmt. ¶ 43.) Plaintiff filed this lawsuit on May 26, 1995.

I.   Acts of Retaliation

Plaintiff claims that Defendants retaliated against her for exercising her federally protected right to file an EEOC complaint alleging unlawful discrimination in violation of Title VII and § 1981. (Compl. 49–50; Pl.'s 56.1 Stmt. ¶ 44; Defs.' 56.1 Stmt. ¶ 44.) Plaintiff asserts that the "Medication Error Incidents" and "The Patient Teaching Incidents," support both Plaintiff's discrimination and retaliation claims. (Pl.'s 56.1 Stmt. ¶ 46; Defs.' 56.1 Stmt.

---

15.   Plaintiff does not dispute that she "was supposed to check off the box on the nurses' notes form to indicate she reviewed with the patients their learning needs," or that "she only sometimes checked it off." (Pl.'s 56.1 Stmt. ¶ 15(e).) The parties dispute, however, whether Dunleavy required other nurses to check it off, and whether other nurses did check it off. (*Id.*) While Plaintiff does name names of white nurses with whom she allegedly discussed both the "teaching check-off boxes" and the "med error" allegations, there is no supporting documentation submitted to the Court by any of the parties of these other nurses' appraisals to establish—one way or the other—what was included (or not) in their appraisals.

16.   Plaintiff states that "the enumeration of topics discussed by Ms. Kelly is not all-inclusive." (Pl.'s 56.1 Stmt. ¶ 40.)

¶ 46.) Additionally, Plaintiff claims that Dunleavy retaliated against Plaintiff by telling her to take the nursing protocol information out of the computer and insert it in patient charts. (Pl.'s 56.1 Stmt. ¶ 46(c); Defs.' 56.1 Stmt. ¶ 46(c).) Plaintiff claims that she asked two other staff members if she should do this and they indicated that doing so was unnecessary. (Pl.'s Dep. at 325–27.) In further support of her retaliation claim Plaintiff also argues that after filing the EEOC complaint she received a lower performance rating on her post EEOC complaint evaluation, (Pl.'s Mem. Law at 9–10.), and was subjected to "hyperintensified observation." (*Id.* at 19.)

## J. Dunleavy's Transfer

On August 24, 1995, Laura Smith ("Smith") and three other African–American nursing attendants filed a grievance with their Union against Dunleavy for discrimination against African–Americans. (Pl.'s Dep. at 266–68; Smith Aff., Ex. A.) Dunleavy was allegedly transferred from Neurology in August 1995. (Smith Aff., ¶¶ 5–6.) Their grievance was withdrawn. (Letter of 10/18/95, Smith Aff., Ex. A.)

## II. DISCUSSION [17]

Defendants move pursuant to Rule 56 of the Fed.R.Civ.P. for summary judgment, asserting that: (1) claims against Dunleavy should be dismissed as there is no individual liability under *Tomka;* (2) Plaintiff has failed to establish a prima facie case of discrimination, retaliation or hostile work environment as required under Title VII and § 1981; and that (3) Plaintiff has failed to establish a prima facie case of intentional infliction of emotional distress. Alternatively, Defendants move pursuant to Rule 12(f) of the Fed.R.Civ.P., to strike Plaintiff's request for damages as having no basis in law.

Plaintiff claims that Defendant's motion for summary judgment should be denied, as Plaintiff has established a prima facie case of discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress. Further, Plaintiff concedes that Dunleavy cannot be held individually liable under *Tomka.* However, Plaintiff requests leave to amend her Complaint to allege a cause of action against Dunleavy under New York State law. Finally, Plaintiff claims that Defendants' motion to strike damages should be denied.

As substantiated by the recitation of Plaintiff's confusing factual allegations in the "Background" section of this Opinion, accurate categorization of her legal claims is elusive. It would appear, viewing Plaintiff's allegations in the light most favorable to the Plaintiff that she is claiming a pattern of disparate treatment between the African–American nurses and the white

---

[17.] In response to Defendant's 56.1 Statement ¶ 14, and ¶¶ 46–47, Plaintiff states: "Plaintiff neither affirms or denies that the aforementioned facts are in dispute, because defendant's intention in listing them is unclear, and apparently does not state them as a contention that they are not in dispute, and plaintiff further reserves the right to dispute the facts contained therein." (Pl.'s 56.1 Stmt. ¶¶ 14, 46–47.) Local Civil Rule 56.1 provides in relevant part:

(c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

(d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible.

It is unclear whether Plaintiff in the instant case intended for ¶ 14, and ¶¶ 46–47, to be controverted; assuming that Plaintiff does controvert these paragraphs, Plaintiff has not satisfied the requirements of Local Civil Rule 56.1, as no citation to evidence was provided. Therefore, these paragraphs will be deemed admitted.

nurses by white supervisors. Whether actually formally claimed or not, the following legal discussion will analyze her allegations under the legal theories of racial discrimination including disparate treatment, retaliation, and hostile work environment.

### A. Individual Liability under *Tomka*

■ As a preliminary matter, under *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir.1995), an employer's agent may not be held individually liable under Title VII, even if she has supervisory control over the Plaintiff. Accordingly, Plaintiff's federal claims against Dunleavy in her individual capacity and in her official capacity as an agent of the Hospital are dismissed.[18]

### B. Summary Judgment

The Court's role on a motion for summary judgment is not to resolve disputed issues of fact, but to determine whether there are any genuine issues for trial. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that summary judgment requires that there be "no genuine issue of material fact"); *Corselli v. Coughlin*, 842 F.2d 23, 25 (2d Cir.1988) (holding that summary judgment was inappropriate when there were "obvious factual conflicts in the record").

In assessing whether summary judgment should be granted, the Court must "resolv[e] ambiguities and [draw] reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11

(2d Cir.1986). "Viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991). If the nonmovant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (citations omitted). A party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight*, 804 F.2d at 12.

### C. Title VII

Title VII of the Civil Rights Act of 1964 provides, in relevant part:

> It shall be an unlawful employment practice for an employer (1) ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

#### 1. Employment Discrimination/Disparate Treatment

■ A complainant in a Title VII action carries the initial burden of establishing a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

---

18. Because Plaintiff's federal claims against Dunleavy have been dismissed pursuant to *Tomka*, 66 F.3d 1295, the Hospital is the only remaining Defendant ("Defendant") for the federal claims.

(1973)); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997). The burden of establishing a prima facie case is *de minimis.* *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). To establish a prima facie case of employment discrimination, plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) that the adverse action took place under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir.2000); *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997); *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995); *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817).

These elements are not intended to become rigid or mechanical, but rather "to promote the general principle that a Title VII plaintiff must carry the initial burden of offering evidence adequate to 'raise[ ] an inference of discrimination.'" *Meiri,* 759 F.2d at 996 (alteration in original) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). When a plaintiff can demonstrate these elements, a presumption of unlawful discrimination is created. *Id.* The burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action visited upon the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (quoting *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817). After the defendant articulates a legitimate reason for the action, the burden switches to plaintiff to show that the defendant's stated reason was merely a pretext for discrimination. *Id.* "The ultimate burden of persuading the trier of fact that the defen-

dant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. 1089.

Although summary judgment must be granted with caution in Title VII actions, "where intent is genuinely in issue, ... summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers,* 43 F.3d at 40 (citations omitted). A plaintiff cannot defeat summary judgment, however, by asserting mere conclusory allegations of discrimination. *Meiri,* 759 F.2d at 998 (holding that "mere incantation of intent or state of mind [cannot] operate as a talisman to defeat an otherwise valid motion"). Therefore, if the defendant has offered legitimate nondiscriminatory reasons for the adverse employment actions, the plaintiff must meet the following burden to survive a summary judgment motion:

[T]he plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994).

i. Prima Facie Case of Discrimination

Plaintiff is African–American. Thus, she has satisfied the first prong of a prima facie case under Title VII. The second prong of a prima facie case, satisfactory job performance, is a fairly low threshold to meet. *Saucier v. Edgewater Constr. Co.,* No. 92 Civ. 1111, 1994 WL 36363, at *6 (N.D.N.Y. Feb. 4, 1994). Plaintiff has satisfied this element as well. Defendant concedes that on the two performance ap-

praisals which Plaintiff received from Dunleavy, (Pl.'s Affirm., Exs. E, F.), Plaintiff received overall ratings of "Exceeds Standard" and "Meets to Exceeds standard." (Defs.' Mem. Law at 8.) Accordingly, Plaintiff has established that her job performance was satisfactory, and thus has also established the second prong of a prima facie case.

Plaintiff fails, however, to meet the third prong, a showing that Plaintiff has suffered an adverse employment action. An employee experiences an adverse employment action where "he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citing *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir.1999) (relying on *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993))). In order to constitute a "materially adverse" action the "change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Galabya*, 202 F.3d at 640 (quoting *Crady*, 993 F.2d at 136). Materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (quoting *Crady*, 993 F.2d at 136); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (tangible employment action is one which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

However, liability under Title VII is not limited "to instances of discrimination in pecuniary emoluments." *Rodriguez v. Board of Educ.*, 620 F.2d 362, 366 (2d Cir.1980). For example, a transfer can, when representing a significant change in the nature of one's work, "constitut[e] interference with a condition or privilege of employment adversely affecting [one's] status within the meaning of [Title VII]." *Id. See also De La Cruz v. New York City Human Resources Admin. Dep't. of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir.1996) (holding that a transfer which "arguably altered the terms and conditions of [Plaintiff's] employment in a negative way," constituted an adverse action); *Meckenberg v. New York City Off–Track Betting*, 42 F.Supp.2d 359, 378 (S.D.N.Y. 1999) (holding that "the denial of a request to transfer to departments where conditions were more favorable constitutes an adverse action"). In addition, terminating an employee's application to receive the additional training necessary to receive new responsibilities is an adverse employment action. *See Fowler v. New York Transit Auth.*, No. 96 Civ. 6796, 2001 WL 83228, at \*5 (S.D.N.Y. Jan. 31, 2001).

In the instant case, Plaintiff has not been terminated, nor has Plaintiff experienced a demotion evidenced by a decrease in wage or salary, a material loss of benefits, or a less distinguished title. Further, Plaintiff has not been transferred, nor did she request an opportunity to transfer to another Department while under Dunleavy's supervision. In fact, Plaintiff worked for Dunleavy in Neurology at the beginning of her tenure at the Hospital, and resumed working under Dunleavy when Plaintiff requested to be transferred back to Neurology in 1993. (Pl.'s Dep. at 26–30, 32–33.)

To satisfy the adverse employment action requirement, Plaintiff cites

"the gossips, the false accusations, the hostile work environment, and the hyperintensified observation" she experienced at the Hospital. (Pl.'s Mem. Law at 19.) However, Plaintiff fails to cite to any specific instances in support of this argument. To the extent that Plaintiff argues Dunleavy wrongfully included incidents and errors on Plaintiff's performance evaluations that never took place, these alleged actions do not constitute an adverse employment action. "Negative evaluations alone, without any accompanying adverse consequence are not adverse employment actions." *Pellei v. Int'l Planned Parenthood Fed'n/W. Hemisphere Region, Inc.*, No. 96 Civ. 7014, 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999) (Title VII claim fails where no showing that employment evaluations caused materially adverse change in condition of employment, such as demotion, suspension, or loss of wages); *see also Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 283–84 (S.D.N.Y.1999) (stating that negative evaluations without any attendant adverse result are not cognizable) (collecting cases), *aff'd*, 2000 WL 232048, 205 F.3d 1327 (2d Cir.2000). Plaintiff has failed to demonstrate that her 1993 and 1994 evaluations, even if incorrect, caused any material change in the conditions of her employment. As an initial matter, Plaintiff has not shown that she received negative employment evaluations. In Plaintiff's 1993 and 1994 evaluations, Plaintiff received a rating of "Exceeds Standard" and "Meets to Exceeds Standard," respectively. (Rasin Aff., Exs. D, E.) At best, Plaintiff has only demonstrated that she had one medication error appropriately listed on her 1993 evaluation, and none listed on her 1994 evaluation. *Id.* Even if the medication error was shown to have been falsely attributed to Plaintiff, which it was not, Plaintiff has not established that its inclusion led to any change in her employment. Further,

Plaintiff's unsupported allegation that the listing of "zero med errors" on Plaintiff's 1994 evaluation implies she "must make a lot of errors," does not strengthen her argument. (Pl.'s Dep. at 149–50.) *See, e.g., Valentine*, 50 F.Supp.2d at 284 ("Plaintiff's subjective perception that he received poorer performance reviews than he deserved does not constitute sufficient adverse employment action for purposes of stating a prima facie case.").

■ The "gossips" Plaintiff cites likewise are not adverse employment actions. *See Gallo v. Herman*, No. 97 Civ. 8359, 1999 WL 249709, at *3 (S.D.N.Y. Apr. 28, 1999) (conclusory allegations that criticisms and warnings of Plaintiff's work led to derision from co-workers, without "specific facts showing either the nature of such derision ... or how it rises to a level that could reasonably be claimed to constitute a change in plaintiff's terms and conditions of employment," is not enough to survive summary judgment), *aff'd*, 2000 WL 233700, 205 F.3d 1322 (2d Cir.2000).

■ To the extent that Plaintiff also alleges that she was denied requests for vacation on Christmas, and that the denial constitutes an adverse employment action, this argument too is without merit. (Pl.'s 56.1 Stmt. ¶ 14(a); Defs.' 56.1 Stmt. ¶ 14(a).) Plaintiff has not pled, much less demonstrated, that the denial of her vacation request was a complete bar on Plaintiff's taking vacation. In fact, Plaintiff took a ten day vacation before Christmas 1994 (from December 16 until December 25), and did not have to return to work until seven o'clock on Christmas night. (Pl.'s Dep. at 100–01.) The particular timing of a vacation is not so disruptive that it crosses the line from "mere inconvenience" to "materially adverse" employment action. Furthermore, Plaintiff has not demonstrated that she was unequivocally entitled to

take vacation days on Christmas.[19] *See, e.g., Lieberman v. Reisman*, 857 F.2d 896, 900 (2d Cir.1988) (stating where defendants have denied plaintiff pay for compensatory and vacation time, "to survive a motion for summary judgment, plaintiff must present evidence demonstrating that she was entitled to and denied a benefit, and that the reason for that denial was [unlawful discrimination]").

Plaintiff's allegations, individually and taken in totality, have not met Plaintiff's burden of establishing an adverse employment action necessary to establish a prima facie case of discrimination. *See, e.g., Fridia v. Henderson*, No. 99 Civ. 10749, 2000 WL 1772779, at *7 (S.D.N.Y. Nov. 30, 2000) (plaintiff's allegations of excessive work, denials of request for leave with pay, and supervisor's poor treatment of plaintiff, without more, insufficient).

Plaintiff has not established the third necessary prong of adverse employment action. Assuming arguendo that she had however, the Court notes that, on the record currently before it, she might have made out a colorable claim on the fourth prong of inference of discrimination. Assuming that her claims of disparate treatment[20] make out a prima facie case, the Defendant has not offered any documentation of white nurses' records or explanation of the Dunleavy transfer and withdrawal of grievance which rebuts Plaintiff's claim or establishes that the Defendant would be entitled to summary judgment on this fourth prong.

As Plaintiff has failed to establish the third prong of a prima facie case of discrimination under Title VII, Plaintiff has failed to meet the burden necessary to survive summary judgment on this claim and Defendant's Motion for Summary Judgment is GRANTED.

### 2. Hostile Work Environment

■ "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Plaintiff claims that while employed at the Hospital she was subject to a hostile work environment actionable under Title VII.[21] Specifically,

---

19. Dunleavy claims that vacation days are distributed as follows: "[O]nce a year the entire staff has the right to file for vacations ... [W]hen there is [sic] multiple submissions of vacation requests, they go in order of seniority ... [A]fter that period of time, when the vacations have been scheduled, it is first come, first served." (Dunleavy Dep. at 122.) Furthermore, the collective bargaining agreement between the New York Nurses Association and the Hospital states under section 7.02, Holidays: Entitlement., that: "Recognizing that the Hospital operates every day of the year and that it is not possible for all employees to be off on the same day, the Hospital shall have the right, at its sole discretion, to require any employee to work on any of the holidays specified herein. The Hospital will, consistent with the needs of the Hospital, distribute holidays off on an equitable basis within titles." (Rasin Aff., Ex. C.)

20. For example, filling out evaluations of the white nurses, denying Plaintiff Christmas vacation in 1994, double checking on the Plaintiff by Dunleavy that she claims the white nurses were not subjected to, and the filing of a grievance by African–American nursing attendants against Dunleavy which was later withdrawn after the Defendant transferred Dunleavy.

21. This Court questions whether the hostile work environment claim is properly before it. To be sure, a complainant need not use the term "hostile work environment harassment" as long as "the essential elements of the charge do appear in the complaint." *See Cruz*, 202 F.3d at 568–69. Here, the Complaint does not contain a count specifically addressing this theory of recovery, and the facts alleged in the Complaint flirt with not providing the factual detail necessary to pres-

Plaintiff argues that she was "subjected to a daily barrage of harassment from Dunleavy and others." (Pl.'s Mem. Law. at 23.) In support of her claim Plaintiff also states that she was accused of "narcotic theft." (*Id.*) Nowhere does Plaintiff elaborate on what acts are included in the phrase "daily barrage of harassment."

■ "A hostile work environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Torres v. Pisano,* 116 F.3d 625, 630–31 (2d Cir.1997) (alterations in original) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) (stating that "incidents must be repeated and continuous," and "isolated acts or occasional episodes will not merit relief"); *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577 (2d Cir.1989) ("The incidents [supporting a hostile work environment claim] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").

■ A hostile work environment claim has both an objective and subjective component:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the

victim's employment, and there is no Title VII violation.

*Harris,* 510 U.S. at 21–22, 114 S.Ct. 367; *see also Torres,* 116 F.3d at 632 ("Whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment."). Whether an environment is "objectively hostile" requires the Court to determine "whether a reasonable person who is the target of the discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." *Richardson v. New York State Dept. Corr. Serv.* 180 F.3d 426, 436 (2d Cir.1999). The reasonable person test, however, does not incorporate the "perspective of the particular ethnic or gender group" to which the plaintiff belongs. *Id.* at 436 n. 5. When considering whether the alleged incidents of harassment constitute a hostile work environment the Court must consider the "totality of the circumstances." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir. 2000). In addition, this Court is aware that the "appalling conduct alleged in prior cases should not mark the boundary of what is actionable." *Id.* at 70.

■ In an effort to assist in the determination of whether conduct is actionable under Title VII, the Supreme Court has established a list of non-exclusive factors. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367; *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Bren-*

---

ent this claim to the Court. However, "a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." *Id.* at 569 (citing Fed.R.Civ.P. 15(b)). Since the hostile

work environment claim has been briefed by both parties, and since Plaintiff has not objected to the Court considering this claim, reaching the merits will not prejudice either party.

*nan v. Metropolitan Opera Assoc., Inc.,* 192 F.3d 310, 318 (2d Cir.1999). These factors include: (1) the frequency of the conduct, (2) its severity, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with an employee's work performance. *See Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367.); *see also Richardson,* 180 F.3d at 437 (adding the consideration of "what psychological harm, if any, resulted" as a fifth factor). "[A] work environment may be actionable if the conduct there is *either* so severe or so pervasive as to alter the working conditions of a reasonable employee." *Richardson,* 180 F.3d at 440. Since a hostile work environment claim involves a mixed question of law and fact, "only where application of the law to those facts will reasonably support only one ultimate conclusion" is summary judgment appropriate. *Id.* at 438.

■■■ Since the Court is required to use a "totality of the circumstances approach" when evaluating a hostile work environment claim, all of the incidents of which Boyd complains will be considered.[22] The problem with Plaintiff's claim, however, is that none of her allegations, either in the aggregate or individually, may be fairly characterized as "discriminatory intimidation, ridicule, or insult." The multi-factored analysis need not be applied indiscriminately to every single workplace-related harm a plaintiff experiences. *See generally Adams v. New Jersey Transit Rail Operations,* Nos. 97 Civ. 430, 97 Civ. 1269, 97 Civ. 1270, 2000 WL 224107, at *13 (S.D.N.Y. Feb. 28, 2000) (internal quotations omit-

ted) ("[T]o sustain a Title VII claim under a hostile work environment theory, plaintiff must present evidence of racially [or sexually] vicious epithets, physically threatening or humiliating actions, or a pattern of such reprehensible behavior over an extended period of time.")

■■■ The incidents that Plaintiff cites in support of her disparate treatment claim are not the types of incidents that support a hostile work environment claim. While the Plaintiff may indeed subjectively feel that the work environment under Dunleavy was a hostile one, Plaintiff's subjective belief is not enough. Furthermore, applying the factors does not persuade the Court that a reasonable person would find the environment to be hostile or abusive. None of the incidents cited by Plaintiff are severe and the incidents taken together are not pervasive. *See Cruz,* 202 F.3d at 571–72 (finding supervisor's use of "blatant racial epithets on a regular if not constant basis" sufficient to survive summary judgment; finding physically threatening behavior where supervisor backed plaintiff into a wall actionable sexual harassment); *Tomka,* 66 F.3d at 1305 (single sexual assault sufficient to create actionable hostile work environment). *But see Richardson,* 180 F.3d at 440 ("severe" harassment does not require a plaintiff to "endure threatened or actual physical assault"). While the incidents cited here may be annoying, bothersome, and even stress-inducing, they are not severe or pervasive. Additionally, none of the incidents cited involved physically threatening or humiliating acts, nor even offensive utterances. Further, the alleged discriminatory conduct does not appear to have unreasonably interfered with Plaintiff's work perfor-

---

**22.** The incidents included in the "Background" section of this Opinion shall be considered along with the class action grievance four African–American nursing attendants filed against Dunleavy, the claims that Plaintiff's work was subject to intensified scrutiny, and the fact that plaintiff received a lower evaluation in 1994.

mance. Although Plaintiff did receive a slightly lower evaluation in 1994, this change does not support the claim that the environment unreasonably interfered with Plaintiff's performance. Plaintiff's 1994 evaluation rated her performance at "Meets to Exceeds Standard." As far as this Court can discern, Plaintiff's 1994 evaluation is still a positive one. Finally, Plaintiff claims that since working on the Neurology floor under Dunleavy she began to frequent a chapel to pray. This change in behavior cannot be fairly characterized as psychological harm. Plaintiff also claims to suffer from hypertension as a result of Dunleavy's conduct. The parties dispute whether or not this physical ailment resulted from Dunleavy's supervision. (Pl.'s 56.1 Stmt. ¶ 54; Defs.' 56.1 Stmt. ¶ 54.) Even assuming that this physical ailment is properly attributed to Dunleavy's supervision, this one factor alone would not tip the scales in Plaintiff's favor.

█ Plaintiff alleges that she was subjected to a "daily barrage of harassment" from Dunleavy and others while working under Dunleavy's supervision. (Pl.'s Mem. Law at 23–24.) However, Plaintiff admits that "The Patient Fall" incident was removed from her 1993 evaluation, that she had a letter from Dunleavy placed in her file which stated that no accusation had been made against her regarding "The Percocet Incident," and that only one medication error was mentioned in Plaintiff's evaluations covering a two year period. (Pl.'s Dep. at 49, 145, 178, 300.) Although Plaintiff claims that the Hospital did not remove, at Plaintiff's request, the one medication error from her 1993 evaluation, and that Dunleavy "harassed" Plaintiff about performing certain duties, Plaintiff has not presented any evidence that these acts were motivated by discriminatory animus. (Pl.'s Mem. Law at 9–10.); *see also Nar-*

*varte v. Chase Manhattan Bank,* No. 96 Civ. 8133, 2000 WL 547031, at *10 (S.D.N.Y. May 4, 2000) (plaintiff "must present evidence that she was discriminated against because of her race").

To the extent Plaintiff alleges her co-workers created a racially hostile work environment, this claim is meritless. Nowhere has Plaintiff suggested that co-workers commented on the "Percocet Incident" to Plaintiff because of her race. Furthermore, Plaintiff's deposition testimony refutes any contention that she subjectively viewed her co-workers' comments as racially hostile. For example, in response to a co-worker's comment that Plaintiff might be arrested by the FBI for taking narcotics home, Plaintiff "just laughed and went inside." (Pl.'s Dep. at 199.)

█ Plaintiff also alleges that she was assigned the most difficult patients on the floor. (Pl.'s Mem. Law at 5; Pl.'s Dep. at 214.) Plaintiff asserts that she "never received a reasonable response" about her patient assignment complaints when she addressed the issue in a meeting with Dunleavy and Joseph. (Pl.'s Mem. Law at 5.) Yet Plaintiff testified that Dunleavy and Joseph told her: "We know you can handle it." (Pl.'s Dep. at 214.) This response is consistent with Plaintiff's own claim to have seniority and with Dunleavy's evaluations rating Plaintiff at "Exceeds Standard" and "Meets to Exceeds Standard." (Rasin Aff., Exs. E, F.)

In sum, Plaintiff has failed to demonstrate any type of hostile work environment. Plaintiff does not allege any physical threat, humiliation, discriminatory intimidation, ridicule, or insult that is attributable to Defendant. Plaintiff has not alleged nor shown a single discriminatory remark at the Hospital. *Compare Whidbee,* 223 F.3d at 66–67 (denying summary judgment where co-worker

directed numerous racially derisive comments and verbal attacks toward other co-workers), and *Cruz*, 202 F.3d at 570–71, (denying summary judgment where Plaintiff's supervisor repeatedly and constantly made racially discriminatory comments and derogatory remarks heard by multiple employees), *with Abouzied v. Mann*, No. 97 Civ. 7613, 2000 WL 1276635, at *5, (E.D.N.Y. Aug. 30, 2000) (supervisor's order "get out of here you Egyptian" coupled with allegations that same supervisor yelled at Plaintiff, unfairly reprimanded him, gave him more difficult job assignments insufficient to state a prima facie case of hostile work place discrimination), and *Adams*, 2000 WL 224107, at *13 ("Broad allegations of verbal abuse and intimidation, coupled with an isolated, gender-based epithet, without more, cannot create a hostile work environment."), and *Broughton*, 64 F.Supp.2d at 69 (grievances relating to work privileges, performance evaluations, and manner of disciplinary notice, insufficient as matter of law; plaintiff never subjected to physically threatening or humiliating conduct, or racially derogatory or offensive comments or utterances), and *Winkfield v. City of New York*, No. 97 Civ. 2183, 1999 WL 1191544, at *3 (S.D.N.Y. Dec. 15, 1999) (of the several incidents cited by plaintiff, that "only two appear[ed] to have any racial overtones" was insufficient to establish a hostile work environment claim).

Plaintiff has not sufficiently supported her claim that she was subject to a hostile environment "permeated with" discriminatory animus. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's Title VII claim of a hostile work environment is also GRANTED.

### 3. Retaliation

Plaintiff filed a charge of discrimination against Defendant with the Equal Employ-

ment Opportunity Commission ("EEOC") and the New York State Division of Human Rights. Plaintiff filed her EEOC Complaint in October 1994, (Pl.'s Affirm., Ex. B.), and this Complaint in May 1995. These filings and the discriminatory treatment Plaintiff alleges she suffered subsequently, serve as the basis for her retaliation claim under Title VII.

In order to make out a prima facie claim of retaliation under Title VII, plaintiff must show "i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action." *Tomka*, 66 F.3d at 1308. Proof of a causal connection can be established indirectly by showing that the protected activity was followed closely by the adverse action. *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996) (citation omitted). Once plaintiff has met her burden, defendant "must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (citing *Tomka*, 66 F.3d at 1308).

Plaintiff has established the first requirement of a prima facie case of retaliation, as the "law is well settled that filing formal EEOC complaints is considered 'protected activity.'" *Ayton v. Lenox Hill Hosp.*, No. 93 Civ. 6601, 1997 WL 10000, at *4 (S.D.N.Y. Jan. 10, 1997) (citing *Kotcher*, 957 F.2d at 65).

Although Plaintiff alleges several instances of retaliation, she has provided no evidence of an adverse employment action. Plaintiff's first allegation, the "Medication Errors Incidents," does not satisfy

the adverse action requirement. As Plaintiff herself notes, she was never reprimanded in connection with either incident. (Pl.'s 56.1 Stmt. at 9; Pl.'s Dep. at 139.) Dunleavy's inquiries regarding these incidents, without more, are not adverse employment actions. Indeed, it is the role of a supervisor to ensure that the supervised employees are properly performing their jobs. Additionally, these 1995 "Medication Error Incidents" were not included on Plaintiff's evaluation covering this period. The one "med error" that was in fact included on Plaintiff's 1993 evaluation belies any claim that the 1995 "Medication Error Incidents" are adverse employment actions, as the 1993 "med error" did not cause the Plaintiff to suffer any adverse employment action. Similarly, as a result of the 1995 "Medication Error Incidents," Defendants never denied Plaintiff a promotion or raise; nor did Plaintiff ever experience a demotion or a change in seniority. (Pl.'s 56.1 Stmt. ¶¶ 48–51.) Therefore, Plaintiff has failed to establish that the "Medication Error Incidents" materially altered Plaintiff's employment status.

■ Plaintiff further asserts that Dunleavy retaliated by assigning Plaintiff a task "not required" of other hospital employees. Dunleavy apparently instructed Plaintiff to copy information from the computer to the patient charts. (Pl.'s Dep. at 325–27.) Plaintiff has not alleged nor shown that this task, even if unnecessary, satisfies the adverse employment action requirement or was in any way related to Plaintiff's EEOC filing or the filing of the instant Complaint.

■ Plaintiff also claims that in retaliation for filing her EEOC Complaint, she received a lower rating on her 1994 evaluation. (Pl.'s Mem. Law at 10, 22.) However, Plaintiff has not demonstrated that a "Meets to Exceeds Standard" rating is considered a negative employment action. (Pl.'s Mem. Law at 22.) Plaintiff cannot rely on her own belief that this is a lesser evaluation than she deserved in order to establish an adverse employment action. *See Valentine,* 50 F.Supp.2d 262, 284 ("Plaintiff's subjective perception that he received poorer reviews than he deserved does not constitute sufficient adverse employment action for purposes of stating a prima facie case."); *see also Richardson v. New York State Dept. of Correctional Serv.,* 180 F.3d 426, 443 (2d Cir.1999) ("[Plaintiff's] conclusory allegation that she deserved an excellent, rather than an average, performance rating is insufficient to establish that the evaluations constitute adverse or disadvantageous actions."); *Regis v. Metro. Jewish Geriatric Ctr.,* No. 97 Civ. 0906, 2000 WL 264336, at *8 (E.D.N.Y. Jan. 11, 2000) ("[E]valuations are adverse employment actions only if they affect ultimate employment decisions such as promotion, wages, or termination."). In this case, Plaintiff cannot establish that her 1994 evaluation constitutes an adverse employment action. Plaintiff must do more than simply demonstrate she received a slightly lower performance rating on the evaluation that followed her EEOC Complaint. Plaintiff has failed to show how, if at all, the 1994 evaluation affected her employment.

Since Plaintiff has not established a prima facie case of retaliation under Title VII, Defendant's Motion for Summary Judgment as to Plaintiff's Title VII claim of Retaliation is GRANTED.

**D. 42 U.S.C. § 1981 Claims of Discrimination and Retaliation**

■ Plaintiff also alleges violations of

42 U.S.C. § 1981.[23] The same elements constitute a claim for employment discrimination under § 1981 as under Title VII. *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 44 (2d Cir.1984). Since Plaintiff has failed to establish a prima facie case of discrimination under Title VII, Defendant is also entitled to summary judgment on Plaintiff's 42 U.S.C. § 1981 claims. *See Saucier*, 1994 WL 36363, at *9 ("[I]f [defendant] is entitled to summary judgment on plaintiff's Title VII claim due to a complete lack of proof, then so too is it entitled to summary judgment on plaintiff's § 1981 cause of action."). Accordingly, the Court hereby GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's 42 U.S.C. § 1981 claims.

## E. Supplemental Jurisdiction

■ Plaintiff also seeks recovery for damages under the New York State common law tort of intentional infliction of emotional distress against all Defendants. (Compl.¶¶ 53–54.) "Whether the court should reach the pendent state claims lies within the sound discretion of the district court." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir.1997) (citing *Morse v. Univ. of Vermont*, 973 F.2d 122, 127 (2d Cir.1992)). Since Plaintiff's federal claims are dismissed, the Court declines to exercise jurisdiction over any of Plaintiff's state law claims. 28 U.S.C. § 1367(c)(3); *DeOcampo v. Information Builders, Inc.*, No. 97 Civ. 3369, 1998 WL 901721, at *5 (having dismissed the federal claim, the court declined to exercise jurisdiction over plaintiff's state law claims). Accordingly, Plaintiff's state law claims are dismissed in their entirety.

## F. Leave to Amend

Plaintiff requests that she be allowed to amend her Complaint to allege a cause of action against Dunleavy under New York Administrative Code §§ 8–101 *et seq.* (Pl.'s Mem. Law at 27.) This statute allows for individual defendants to be sued in their personal capacities for violations parallel to those under Title VII. *Tomka*, 66 F.3d at 1313. Because Plaintiff's federal claims are dismissed and the Court declines to exercise jurisdiction over Plaintiff's state law claims, Plaintiff's request to amend is DENIED.

## III. CONCLUSION

For the foregoing reasons, Plaintiff has failed to establish a prima facie case of discrimination under Title VII and 42 U.S.C. § 1981. Because all of Plaintiff's federal claims are dismissed, the Court declines to exercise jurisdiction over Plaintiff's state law claims. Accordingly, Defendants' Motion for Summary Judgment is GRANTED in its entirety. The Clerk of the Court is directed to close the docket in this matter.

SO ORDERED.

---

**23.** 42 U.S.C. § 1981(a) provides:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.